GREATER MEDIA, INC., & others[1] *vs.* DEPARTMENT OF
PUBLIC UTILITIES; NEW ENGLAND TELEPHONE AND
TELEGRAPH COMPANY, intervener.

Suffolk. March 1, 1993. - June 7, 1993.

Present: LIACOS, C.J., NOLAN, LYNCH, O'CONNOR, & GREANEY, JJ.

*Community Antenna Television Systems. Administrative Law*, Agency's
interpretation of statute, Substantial evidence. *Public Utilities*, Rate
setting, Judicial review.

In a proceeding pursuant to G. L. c. 166, § 25A, to establish a telephone
utility's "reasonable" charge for the use of its conduit space by an oper-
ator of cable television systems, it was statutorily permissible for the
Department of Public Utilities to allocate the utility's costs according to
a methodology that excluded conduit space that was unusable because
it was reserved for maintenance and municipal purposes. [413-415]

In a proceeding before the Department of Public Utilities pursuant to
G. L. c. 166, § 25A, to establish a telephone utility's "reasonable"
charge for the use of its conduit space by an operator of cable television
systems, the department's determination as to the amount of conduit
space that was reserved for municipal and maintenance purposes, and
thus excludable from the allocation of the utility's costs, was supported
by substantial evidence. [415-419]

In a proceeding in which the Department of Public Utilities concluded that
a telephone utility's charge for the use of its conduit space by an opera-
tor of cable television systems exceeded a "reasonable" rate as pre-
scribed by G. L. c. 166, § 25A, the department acted within its discre-
tion in determining that the newly established rate would take effect as
of the date the cable operator filed its complaint with the department,
rather than as of the date the superseded rate was first applied. [419-
421]

---

[1]Greater Media, Inc., is the parent company of Greater Media
Cablevision, Inc. Greater Media Cablevision, Inc., is, in turn, the parent
company of Greater Worcester Cablevision, Inc., Greater Chicopee
Cablevision, Inc., and Greater Massachusetts Cablevision, Inc. Greater
Massachusetts Cablevision, Inc., is the parent company of Greater Oxford
Cablevision, Inc., and Greater Millbury Cablevision, Inc. All are plaintiffs
to this action.

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on May 15, 1992.

The case was reported by *Greaney*, J.

*Alan D. Mandl* for the plaintiffs.

*Thomas A. Barnico*, Assistant Attorney General, for the defendant.

*A. Eric Rosen* for the intervener.

LYNCH, J. This appeal by Greater Media, Inc., and inter-related cable television companies (Greater Media) challenges a decision of the Department of Public Utilities[2] (department) concerning rates charged by New England Telephone and Telegraph Company (NET) for use of conduit space. The department found that the rates charged by NET from 1984 through 1991 were not reasonable as required by G. L. c. 166, § 25A (1990 ed.), and ordered NET to reduce its rates retroactively to the date of the complaint. Greater Media, pursuant to G. L. c. 25, § 5 (1990 ed.), entered an appeal in the Supreme Judicial Court for Suffolk County. A single justice reserved and reported the case to the full court without decision.[3] We affirm.

Greater Media owns and operates cable television (CATV) systems serving approximately 72,000 customers in central Massachusetts.[4] In order to construct its cable network and extend its lines to reach its customers, Greater Media must install television cable in ducts located in underground conduit structures owned and operated by NET.[5] NET charges Greater Media an annual fee for each duct foot of NET conduit which it occupies. Beginning in 1981 and continuing until the time of this suit, NET charged $1.90 per foot per year

---

[2]*Greater Media, Inc.*, D.P.U. 91-218.

[3]Prior to the reservation and report of the case, another single justice allowed NET to intervene.

[4]The communities include Worcester, Auburn, Leicester, Spencer, Westborough, Sturbridge, Chicopee, Oxford, and Millbury.

[5]NET defines a conduit as "a structure, usually underground containing ducts providing carrying capabilities and protection to underground cable." NET defines a duct as "a single enclosed pipe raceway for wire conductors or cables within a conduit system."

for the use of a full duct, and $.95 per foot per year for the use of a half-duct. Pursuant to G. L. c. 166, § 25A, inserted by St. 1978 c. 292, § 1, the department has the authority to prescribe "reasonable" rates for both pole and conduit attachments. See note 12, *infra.* While the department has not determined a specific method of calculating reasonable attachment rates, it has ruled that, under St. 1978, c. 292, § 2, "the maximum rate has two general components: (1) the capital and operating expenses (or the so-called 'carrying charges') and (2) the proportional share of the pole or conduit occupied by the CATV operator (or the space occupied by the CATV divided by the *total usable space*)" (emphasis added).[6] *New England Cable Television Ass'n,* D.P.U. 930 (hereafter D.P.U. 930). Should the department determine that a rate complained of is not reasonable, it has the option of terminating the unreasonable rate and substituting a reasonable one. 220 Code Mass. Regs. § 45.07 (1986).

Greater Media's principal claim before the department was that the rates for conduit use were "unreasonable," and it requested that the department terminate the rates, substitute new rates, and order NET to refund the amounts charged in excess of the maximum lawful rate after January 1, 1984. NET denied the claim and opposed retroactive relief. NET also argued that the department lacked authority to award retroactive relief and, even if it had such authority, it should not award such relief in this case since Greater Media unjustifiably delayed its complaint for several years.

The department found that NET's rate for conduit space was unreasonable under G. L. c. 166, § 25A. The department reduced NET's rates to $.84 per foot per year for use of full duct conduit space, and $.42 per foot for half-duct

---

[6]The formula arrived at appears as follows:

$$\text{Fully Allocated Cost Per Foot of Full Duct} = \frac{\text{Carrying Cost of Conduit}}{\text{Usable Conduit Space in Duct Feet}}$$

space. The department ordered NET to modify the agreement with Greater Media to reflect the new rate, effective October 21, 1991, the date Greater Media's complaint was filed. The department made additional rulings which we set out in the margin.[7]

In this appeal, Greater Media argues that the department improperly calculated the new rates and that its decision not to grant refunds prior to the date of the complaint was incorrect. The department calculated the rate by determining "the carrying cost to NET of its conduit and the amount of usable space, i.e., the applicable quantity of feet of duct over which such costs should be distributed."[8] As the data source for its calculations, the department adopted Greater Media's proposal and used NET's "Form M," a report filed with the Federal Communications Commission (FCC).[9] The method for calculating the "conduit carrying cost" figure arrived at is not disputed.[10]

The "amount of usable space," however, is the center of Greater Media's first argument on appeal. The department stated: "In order to calculate the fully allocated conduit carrying cost on a per-foot basis, we must first determine the total number of duct feet to which costs shall be allocated." Greater Media argued that the department should calculate this amount using the total amount of installed NET duct feet in Massachusetts as listed on NET's Form M. Use of this figure would have decreased Greater Media's share of

---

[7]The department also decided: Greater Media's motion for interim relief was moot; NET shall substitute the new rate in all of its conduit attachment license agreements, effective July 1, 1992; the full duct rate shall be charged by NET only where the licensee's attachment precludes subsequent use of a duct; and the rate change would not have an adverse effect on NET ratepayers or CATV subscribers.

[8]The formula for the department's calculation is the same as that in D.P.U. 930. See note 6, *supra.*

[9]The department adopted the use of Form M data because the forms were readily available, filed annually with the department, less burdensome to apply, and facilitated resolution of future rate disputes.

[10]The department calculated the conduit carrying cost by multiplying NET's net conduit investment by its carrying charge.

costs since the total conduit costs would be allocated to more space, and Greater Media's share of the total space would be lower. The department, however, found it "appropriate to modify the Form M data to reflect the [duct] space that is unusable because it is reserved for maintenance and for municipalities."[11]

1. *Claim under G. L. c. 166, § 25A.* Greater Media first argues that the department's exclusion of unusable conduit space was contrary to St. 1978, c. 292, § 2.[12] That statute limits maximum attachment rate to:

---

[11]The department stated: "[I]n order to determine the measure of duct feet to which costs shall be allocated, G. L. c. 166, § 25A must be read together with D.P.U. 930, the Department's Order adopting regulations for conduit and pole attachments. In its interpretation of the statutory standard, the Department considered usable space, rather than total conduit capacity, to be the proper measure when it defined the proportional share of the pole or conduit occupied by the attacher as 'the space occupied by the [attacher] divided by the total usable space.' [D.P.U. 930 at 5 (1984).] Therefore, in calculating the fully allocated cost on a per-foot basis, we must identify 'usable' duct feet."

[12]General Laws c. 166, § 25A, inserted by St. 1978, c. 292, § 1, states in pertinent part: "The department of public utilities shall have authority to regulate the rates, terms and conditions applicable to attachments . . . and upon its own motion or upon petition of any utility or licensee said department shall determine and enforce reasonable rates, terms and conditions of use of poles or of communication ducts or conduits of a utility for attachments of a licensee in any case in which the utility and licensee fail to agree."

Section 2 of St. 1978, c. 292, states in pertinent part: "The department, pursuant to [G. L. c. 166, § 25A], inserted by section one of this act, shall determine a just and reasonable rate for the use of poles and communication ducts and conduits of a utility for attachments . . . by assuring the utility recovery of not less than the additional costs of making provision for attachments nor more than the proportional capital and operating expenses of the utility attributable to that portion of the pole, duct or conduit occupied by the attachment. Such portion shall be computed by determining the percentage of the total usable space on a pole or the total capacity of the duct or conduit that is occupied by the attachment."

Section 3 of St. 1978, c. 292, originally provided: "Section two of this act shall become inoperative" on January 1, 1984. By amendment, however, the expiration date of § 2 has been extended through December 31, 1996. See St. 1983, c. 435; St. 1986, c. 323; St. 1988, c. 88; St. 1990, c. 393; St. 1992, c. 309.

"[No] more than the proportional capital and operating expenses of the utility attributable to that portion of the pole, duct or conduit occupied by the attachment. Such portion shall be computed by determining the percentage of the *total usable space on a pole or the total capacity of the duct or conduit that is occupied by the attachment*" (emphasis added). St. 1978, c. 292, § 2.

Greater Media claims that the statute requires the department to apply a different standard for poles and conduits, and that the department erred by including only usable space, and not "the total capacity of the duct or conduit," in its calculations. We disagree.

In questions of statutory interpretation, "ordinary precepts of statutory construction instruct us to accord deference to an administrative interpretation of a statute." *Massachusetts Org. of State Eng'rs & Scientists* v. *Labor Relations Comm'n*, 389 Mass. 920, 924 (1983). This is particularly so "where, as here, an agency must interpret a legislative policy which is only broadly set out in the governing statute." *Id.,* quoting *School Comm. of Springfield* v. *Board of Educ.*, 362 Mass. 417, 442 (1972). General Laws c. 166, § 25A, and St. 1978, c. 292, § 2, confer broad authority on the department to calculate and to enforce reasonable rates. In its 1984 order interpreting G. L. c. 166, § 25A, and St. 1978, c. 292, § 2, the department did not attribute different meanings to the terms "usable space" and "total capacity." D.P.U. 930. Rather, it ruled that the "usable space" standard was the applicable unit of measurement for allocating attachment costs for both poles and conduits. *Id.* The department adopted this "usable space" approach in formulating a reasonable rate in this case. Moreover, since the definition of "[u]sable space" in G. L. c. 166, § 25A, expressly refers to both poles and conduits, it is likely that the Legislature intended that the same standard apply to both poles and con-

duits.[13] "[I]n the absence of a plain contrary indication, a word used in one part of a statute in a definite sense should be given the same meaning in another part of the same statute." *Plymouth County Nuclear Info. Comm., Inc.* v. *Energy Facilities Siting Council*, 374 Mass. 236, 240 (1978). See *Kargman* v. *Commissioner of Revenue*, 389 Mass. 784, 788 (1983) ("statutes should be interpreted as a whole to constitute a consistent and harmonious provision"). If the Legislature had intended that different standards be used, it would not have included conduits in the definition of usable space. See *Beeler* v. *Downey*, 387 Mass. 609, 617 (1982); *Commonwealth* v. *Woods Hole, Martha's Vineyard & Nantucket S.S. Auth.*, 352 Mass. 617, 618-619 (1967). Since the statute includes both poles and conduits in its definition of usable space, we conclude that the department's interpretation of usable space in the calculation did not violate § 2 of St. 1978, c. 292.

Greater Media argues that, even if a "usable space" standard were appropriate, the department's methodology violated this statute since the duct space excluded constituted "attachments previously made."[14] Since the department found that maintenance and municipal duct space was not available for attachments, it was within the department's discretion to rule that the excluded duct space did not constitute "attachments previously made." St. 1978, c. 292, § 1. *Massachusetts Org. of State Eng'rs & Scientists* v. *Labor Relations Comm'n*, *supra* at 924. The department's decision did not violate the statute.

2. *Substantial evidence claims.* After settling on a usable space standard, the department heard evidence on the issue of what constituted usable duct space. The department found that "[t]he record . . . indicates that NET reserves two ducts per trench foot for maintenance and for municipal use." The

---

[13]"Usable space," as defined by the statute, is "the total space which would be available for attachments, without regard to attachments previously made . . . upon a pole . . . or . . . within any telegraph or telephone duct or conduit." G. L. c. 166, § 25A.

[14]See note 13, *supra.*

department stated that, though the maintenance ducts were clearly "usable" in the plain sense of the word, they were not usable according to the definition that governs the department's resolution of attachment complaints, because they were not available for attachments. The department also found that "the record indicates that NET reserves one duct for municipal purposes in all but two municipalities in which it maintains conduit . . . . NET indicated that, in limited instances, it has used duct that was set aside for municipalities, but that it restores the duct to municipal purposes as soon as possible . . . . Although some communities may not use the duct that NET sets aside for municipal purposes, there is no evidence to suggest that, with the exception of Worcester, NET uses such duct on a regular basis. The record indicates that the use of municipal duct in Worcester is the exception and not the norm, and therefore, we find it reasonable to consider municipal duct unusable for attachers."

In calculating the amount of maintenance and municipal duct space to be considered unusable, the department conceded that there were "no data available . . . that would enable a precise determination of the duct that is reserved for these two purposes." However, the department arrived at a formula "[b]ased on NET's estimate that it reserves two duct feet of every trench foot for municipal and maintenance purposes . . . ."[15] Based on this formula, the department found "it reasonable to assume that 35 percent of the duct feet that are reported in Form M are unusable."[16]

---

[15]The department then calculated the amount of duct space reserved for maintenance and municipalities as follows: "In its June 1990, Quarterly Report Number 7A . . . NET identified 159,693,600 total duct feet and 5,260 total trench miles. NET estimated that two ducts per trench foot are reserved for municipal use and maintenance. Therefore, to estimate the amount of reserved conduit, first, 5,260 total trench miles are multiplied by 5,280 feet per mile for a total of 27,772,800 trench feet. Then, because NET estimates that two ducts per trench foot are reserved for municipal use and maintenance, the total trench feet figure is doubled to estimate 55,545,600 feet of reserved duct feet. Finally, NET's estimate of reserved duct is 34.78 percent of the total reported duct feet . . . ."

[16]Using the data in NET's 1990 Form M, the department then subtracted the amount of unusable duct feet from the total amount of total

"Judicial inquiry under the substantial evidence test is limited to a determination of whether, within the record developed before the administrative agency, there is such evidence as a reasonable mind might accept as adequate to support the agency's conclusion." *Seagram Distillers Co.* v. *Alcoholic Beverages Control Comm'n*, 401 Mass. 713, 721 (1988). G. L. c. 30A, § 1 (6) (1990 ed.). We accord "due weight to the experience, technical competence, and specialized knowledge of the agency, as well as to the discretionary authority conferred upon it." *Flint* v. *Commissioner of Pub. Welfare*, 412 Mass. 416, 420 (1992), quoting G. L. c. 30A, § 14 (7) (1990 ed.). Factual disputes and matters of credibility are for the agency, not this court, to resolve. *Martorano* v. *Department of Pub. Utils.*, 401 Mass. 257, 261 (1987).[17]

Review of the record indicates that the department's findings were based on substantial evidence. A witness for NET testified that duct space was reserved in each conduit system so that NET could respond to emergency conditions such as physical damage to cables in other ducts. Evidence before the department also showed that, in order to obtain authority to construct a conduit under public ways, NET must reserve a duct within the conduit for use by the municipality and that, even if not used by the municipality, NET is not relieved of its obligation to ensure that the duct is available. In addition, evidence was presented that, while NET may make temporary use of a municipal conduit to provide service on an emergency basis, it usually expands the capacity as soon as possible and includes a new municipal duct in that expansion.

---

duct feet, and found that the total usable space for conduit attachment purposes was 105,329,113 feet. We conclude that these findings were adequately supported by the department's conclusions.

[17]Greater Media opens its substantial evidence argument by claiming that NET's internal accounting and cost of service studies treated every duct foot reported in the Form M as "usable." NET argues that this claim is misleading. We decline to address either argument since the issue before this court is whether the department's decision is supported in the record.

With regard to the department's findings on duct space in the city of Worcester, NET presented evidence that the city continued to require that NET build and maintain duct without charge. Furthermore, since the department was setting a State-wide rate, the department was justified in treating Worcester as "the exception and not the norm." See *Massachusetts State Pharmaceutical Ass'n* v. *Rate Setting Comm'n*, 387 Mass. 122, 136 (1982).

Contrary to Greater Media's claim, the data that the department used for its calculations were neither arbitrary nor capricious so as to constitute an abuse of discretion. NET presented evidence that obtaining actual data would be difficult, costly, and of limited future utility. The department, thus, decided to use NET's estimates of the duct space along with conduit and duct estimates from NET's Form M. The determination was properly within the discretion of the department. See *Aetna Casualty & Sur. Co.* v. *Commissioner of Ins.*, 408 Mass. 363, 375 (1990) (within discretion of department "to determine the weight to be given to certain evidence supporting or detracting from reliance on particular methodologies or data"); *Attorney Gen.* v. *Department of Pub. Utils.*, 392 Mass. 262, 268 (1984) ("Where the result of employing a specific methodology in rate setting is not impermissible, the choice of the methodology is a matter committed to agency discretion and is beyond the scope of our review").

Greater Media also argues in a paragraph of four sentences that the department's calculations violate Federal law. Their presentation, however, merely recites the Federal statutory provisions that arguably have been violated and does not provide meaningful citation of authority. This does not rise to the level of proper appellate argument on a question of constitutional dimension under Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975), and Mass. R. A. P. 16 (b), 365 Mass. 860 (1974). We, therefore, decline to address the argument. *Rate Setting Comm'n* v. *Faulkner Hosp.*, 411 Mass. 701, 707 (1992). We conclude that the department's exclusion of conduit space reserved for mainte-

nance and municipal purposes was supported by substantial evidence and was not so irrational as to constitute an error of law.

3. *Refunds.*

a. The department ruled that the new rate would be effective on the date Greater Media filed their complaint, and refused to grant refunds prior to that date. In reaching this decision, the department followed an analogous FCC regulation which provides that refunds be allowed "from the date that the complaint, as acceptable, was filed, plus interest." 47 C.F.R. § 1.1410 (c) (1991).[18] Greater Media contends that, since the department is required to "determine and enforce reasonable rates,"[19] it should have granted refunds back to 1984 when the rates were first applied. We disagree. General Laws c. 166, § 25A, does not require any retroactive relief. However, it does confer broad authority on the department to determine reasonable rates and provide remedies to enforce them. See *Commissioner of Pub. Health* v. *Board of Health of Tewksbury*, 350 Mass. 507, 509 (1966) (ordinary meaning of "enforce" is "to compel obedience to" or "to cause to be executed"). The method that the department chose to determine and to enforce its rates is consistent with this general grant of authority. See 220 Code Mass. Regs. § 45.00 (1986); *Massachusetts Org. of State Eng'rs & Scientists* v. *Labor Relations Comm'n, supra* at 924. See also *Massachusetts Hosp. Ass'n* v. *Department of Medical Sec.*, 412 Mass. 340, 345-346 (1992) ("We grant substantial deference to an interpretation of a statute by the administrative agency charged with its administration").[20]

---

[18]NET argued that the department did not have the authority to award any retroactive relief. The department disagreed stating, "With regard to NET's argument that the Department is limited to the remedies found in section 45.07, we note that failure to include a refund provision in this section of the regulations does not limit the Department's authority to allow such a remedy, under the appropriate circumstances."

[19]See note 12, *supra*.

[20]The cases relied on by Greater Media on this issue are unpersuasive. In particular, *Boston* v. *Edison Elec. Illuminating Co.*, 242 Mass. 305 (1922), does not acknowledge a common law obligation of utilities to re-

b. The department decided: "We agree with the FCC that complaints should be filed promptly." The department then continued: "Our regulations governing complaints regarding attachment rates have existed since 1984, yet Greater Media did not file a complaint with the Department until late 1991. While the Complainants state that their failure to dispute the rate prior to 1991 is attributable to fear of retaliation by NET during a period in which they were expanding their facilities, the record contains no evidence of retaliation or threats of retaliation by NET . . . . In sum, we are not persuaded that Greater Media's delay in filing a complaint is justified, and therefore, deny their request for relief dating back to 1984."

Greater Media argues that these findings were not supported by substantial evidence. In support of its position Greater Media advances the same arguments that it presented to the department below. This presents us with factual questions involving assessments of credibility which the department chose to resolve in favor of NET. *Martorano v. Department of Pub. Utils., supra* at 264. "It is not for this court to disturb that choice." *Id.* "The proper function of the court is not to engage in complex fact determinations more appropriately committed to an agency, with staff and skilled experience to make them. Rather, the court must accept the factual determinations made by the agency if it finds that they are supported by substantial evidence . . . ." *Id.*, quoting *School Comm. of Boston v. Board of Educ.*, 363 Mass. 125, 128 (1973).

c. Greater Media argues that NET "knowingly ignored the mandatory statutory limitations on its conduit attachment charges" and that the department's failure to grant precomplaint refunds from these rates unjustly enriches NET. This argument is without merit. There was no finding by the department to support this contention. Instead, the

---

frain from charging exorbitant rates. Instead, it holds that a consumer cannot maintain an action against a public utility to recover rates unreasonably exacted where the Commonwealth had established the department to regulate the rates and protect the consumer.

record shows that NET has simply charged Greater Media the same rate continuously since 1981 and that the rate has been open to challenge since then. Moreover, NET detailed its view of the appropriate rate making methodology for conduit in 1982 in comments filed in D.P.U. 930. Similarly, we also reject the contention that the department abused its discretion in failing to consider the interests of CATV subscribers in not allowing Greater Media to collect retroactive relief prior to the filing of the complaint. The department expressly stated that it made such considerations in its decision.[21]

4. *Conclusion.* In summary, therefore, we reject Greater Media's contentions that: (1) the department's methodology in calculating the new rate was improper; (2) the department's calculations were not supported by substantial evidence; and (3) the department erred by not granting refunds prior to the date Greater Media filed its complaint. A judgment affirming the department's decision is to enter in the Supreme Judicial Court for the county of Suffolk.

*So ordered.*

---

[21]The department stated: "In determining the appropriate rate for conduit attachment charges, the Department has considered the interests of subscribers of cable television services as well as the interest of consumers of utility services. . . . With regard to CATV subscribers, Greater Media indicates that a decrease in rates will lessen pressure to increase cable rates and may cause a slight reduction in rates . . . . Therefore, we find that the resolution of this case will have no adverse effect, and should have a beneficial effect, for cable television subscribers."