Donohue, J.
MEMORANDUM OF DECISION AND ORDER ON PLAINTIFFS APPEAL FROM AN ADMINISTRATIVE PENALTY AND ALJ DECISION PURSUANT TO G.L.c 30A[1]
Plaintiff Central Water District Associates (“CWDA”) brings this action seeking judicial review of a decision rendered by the Department of Environmental Protection (“DEP”) assessing a Civil Administrative Penally (“PAN”) against CWD[2] and the subsequent affirmance of this penally by an Administrative Law Judge (“ALJ”).[3]
BACKGROUND[4]
CWDA is the owner of Burncoat Pond located in the towns of Spencer and Leicester. In the spring of 1986, CWD noticed that additional water was flowing through the dam on Burncoat Pond. Further investigation revealed that the spillway gate was stuck open approximately six inches due to an object lodged in the gate. As a result, CWD began to formulate plans to repair the dam. The Leicester Conservation Commission (“LCC”) learned of CWD’s plans to repair the dam and, on July 29, 1986, sent a letter to CWD expressing concern over the repairs. Specifically, the LCC informed CWD that “a lowering of a pond does constitute an alteration under the Wetlands Laws.”
CWD responded to this letter and expressed its belief that a recent case, Bourne v. Austin, 19 Mass.App.Ct. 738 (1985), exempted CWD’s intended repairs from the provisions of G.L.c. 131, §40, the Wetlands Protection Act.
Approximately three months later the Department of Environmental Management (“DEM”) conducted an *82 inspection of the dam on Burncoat Road pursuant to its authority under G.L.c. 253, §§44-50. The DEM concluded that deficiencies which dated back to 1976 still existed. The report also stated that although CWD intended to make minor repairs to the dam in April of 1987, such repairs would not be sufficient to correct the deficiencies found by the DEM inspection. Accordingly, on December 3, 1986, the DEM sent a Notice of Inspection to CWD informing it that it had one year to correct the deficiencies.
On April 21, 1987, CWD sent a letter to the LCC notifying the Commission of CWD’s intent to lower the pond by approximately 4-6 feet during the month of May. The letter stated that the action was being taken “for the purpose of cleaning, refacing and making any repairs to the dam that may be necessary.”
The letter did not mention any emergency conditions which would have necessitated this action. CWD did not file a written notice of intent with the LCC nor did CWD seek an order of conditions or a determination from the LCC that the proposed work was exempt from the Wetlands Act.
On May 4, 1987, CWD lowered the water level in the pond and began repairing the dam. CWD maintains that the repair work was in response to emergency conditions. Specifically, CWD states that on April 6, 1987 (one month before the repairs began) a thread on the gate snapped resulting in the gate being stuck open approximately seven inches. Until this point, the gate had been stuck open six inches. Additionally, heavy rains in the area had caused serious flooding.
On May 29, 1987, the LCC issued an enforcement order charging CWD with lowering the water level of Burncoat Pond in violation of G.L.c. 131, §40. The order stated that the “drawdown” adversely affected various animals, fish, and birds as well as the vegetation bordering the pond. CWD responded by sending a letter to the LCC stating that it was CWD’s “position that we can raise and lower the Dam at any time for whatever public or private purpose . . . without notification to you or your Commissioner.” On June 2, 1987, the DEP issued a similar order. Subsequently the DEP issued a PAN assessing a $15,400 penally against CWD. CWD appealed this assessment to an ALJ.
Prior Administrative Proceedings
CWD and the DEP filed cross-motions for summary decision. The ALJ denied CWD’s motion and granted the DEP’s motion in part. The ALJ held that CWD violated the provisions of G.L.c. 131, §40 but that genuine issues of material fact existed concerning the amount of the penalty and the question of whether Burncoat Pond was a great pond pursuant to G.L.c. 91.[5]
At the hearing, the DEP conceded for purposes of this action that Burncoat Pond was not a great pond. At the end of the hearing the ALJ reduced the PAN from $15,400 to $7,800 but otherwise upheld the PAN. The ALJ subsequently denied CWD’s motion for reconsideration.
Applicable Laws
The resolution of the plaintiffs c. 30A appeal involves the interpretation and interplay of three specific environmental statutes: G.L.c. 131 (the Wetlands Protection Act), G.L.c. 253, §§42-53 (the Dams Safely Act), and G.L.c. 21A (the Civil Administrative Penalty Act) as well as the applicable regulations (generally 310 Code Mass. Reg.). Relevant sections of these statutes and regulations are cited throughout this opinion. By way of introduction, however, the court provides a brief overview of these statutes.
G.L.c. 131 generally gives local conservation commissions as well the DEP supervisory control over all projects involving the alteration of a wetland including the banks of a pond.
G.L.c. 253, §§42-53 generally gives the DEM the power to regulate dams and their safety and adequacy.
Finally, G.L.c. 21A provides for civil administrative penalties for violations of the Commonwealth’s environmental laws.
DISCUSSION
Pursuant to G.L.c. 30A, §14(7), this court may affirm, remand, set aside or modify the respondent’s decision if it is determined that a party’s substantial rights were prejudiced because the decision was: (1) in violation of constitutional provisions: (2) in excess of statutory authority or jurisdiction of the agency: (3) based on an erroneous interpretation of the law; (4) made upon unlawful procedure: (5) unsupported by substantial evidence or (6) arbitrary or capricious. G.L.c. 30A, §14(7); Pyramid Co. of Hadley v. Architectural Access Bd., 403 Mass. 126, 130 (1988); Winn v. Architectural Access Bd., 25 Mass.App.Ct. 41, 42 (1987). “Substantial evidence” is that evidence which a reasonable mind might accept as adequate to support a conclusion. Vaspourakon Ltd. v. Alcoholic Beverage Control Comm’n., 401 Mass. 347, 351 (1987).
The court defers to the “technical competence and specialized knowledge of the agency as well as to the discretionary authority conferred upon it.” Greater Media, Inc. v. Dept. of Public Utilities, 415 Mass. 409, 417 (1993) (citations omitted). Accordingly, this court may not make a de novo determination of the facts, make different credibility choices, or draw different inferences from the facts found by the agency. Pyramid, supra, at 130 (citations omitted).
Essentially, plaintiff asserts that the ALJ’s decision must be reversed based on all five of the factors listed above. The court disagrees and addresses each of the factors, seriatim.[6]
*83 Constitutional Provisions
CWD first argues that G.L.c. 21A, §16 (the Civil Administrative Penalty Act) is, on its face (and, presumably, in its application to this case) unconstitutional. Specifically, CWD claims that G.L.c. 21A, §16 violates the following provisions of the Massachusetts Constitution: Article XXX of the Declaration of Rights (separation of powers); Part. II, Chapter 1, §1, Art. 3 (granting the general court the power to create courts to try civil and criminal cases); Articles XI (criminal due process); XII (trial by jury in criminal cases); XTV (freedom from unreasonable search & seizure); XV (trial by jury in civil cases); and XVI (freedom of speech).
Many of these provisions are simply inapplicable to the present case and need not be addressed. Moreover for the most part, CWD does not explain how the application of c. 21A was violative of these provisions. Insofar as the plaintiff has the burden of proof in challenging the constitutionality of c. 21A, CWD’s bare assertions of constitutional infirmity are insufficient to satisfy this burden. Fiorvanti v. State Racing Commission, 6 Mass.App.Ct. 299 (1978). In any event, a thorough review of the administrative record by this court has failed to reveal any constitutional infirmities in the agency proceedings or in the application of G.L.c. 21 A.
To the extent that the plaintiff does, however, make specific arguments concerning the constitutionality of c. 21A, none of these arguments are persuasive. Plaintiffs first argument is that c. 21A denies him his right to a jury trial. As the statute does not provide for a jury trial and no “analogous civil proceedings existed at common law,” there is no right to a jury trial. See Zora v. State Ethics Commission, 415 Mass. 640, 652-53 (1993).
Likewise, plaintiffs argument that the bond provision of G.L.c. 21A, §16 is unconstitutional is without merit. Section 16 requires a party challenging a final penalty assessment to place the entire amount of the assessment into an interest-bearing escrow account. Similar provisions have long been held constitutional. “A State ‘may properly take steps to insure that an appellant post adequate security before an appeal to preserve the property at issue [or] to guard a damage award already made.’ ” Hampshire Village Associates v. District Court of Hampshire, 381 Mass. 148, 153 (1980), quoting Linsey v. Normet, 405 U.S. 56, 77 (1972). See also Damaskos v. Board of Appeal of Boston, 359 Mass. 55, 56-57 (1971) (and cases cited therein).
Finally, plaintiffs argument that G.L.c. 21A “has no authority from the people to find facts and make conclusions of law and impose sanctions,” is incomprehensible.
Statutory and Jurisdictional Authority
CWD next argues that the DEP had no authority to issue the PAN (or subsequently enforce the PAN) as the DEM has exclusive authority under G.L.c. 253, §§42-53 to regulate dams and ensure their safety and adequacy. Alternatively, CWD argues that the DEM’s issuance of an inspection report, requiring CWD to make certain repairs, took said repairs out of the jurisdiction of the DEP. The court does not agree. Massachusetts case law provides that when two statutes, like the Wetlands Protection Act and the Dams Safely Act, deal with the same subject matter they should be construed in a manner which gives reasonable effect to both and creates a consistent body of law. See, Boston Housing Authority v. Labor Relations Commission, 398 Mass. 715, 718 (1986); Boston v. Board of Education, 392 Mass. 788, 792 (1984); Jones v. Wayland, 380 Mass. 110, 118 (1980). In the present case, nothing prevented the plaintiff from complying with the provisions of both G.L.c. 253, §47 and G.L.c. 131, §40.
CWD, however, argues that its repair of the dam was an “emergency action” pursuant to c. 253, §47 and that CWD was therefore relieved of its duty to comply with the notice requirements of c. 131, §40. Chapter 253, §47 provides, in relevant part:
Any emergency action taken by the owner of a dam pursuant to the commissioner’s order, or any emergency action taken by the commissioner, may be taken without any prior filing with the conservation commission under section forty of chapter one hundred and thirty-one.
The ALJ determined that CWD’s actions were not emergency actions exempting CWD from compliance with c. 131, §40. The administrative record shows that CWD did not begin repairs on the dam when it first learned of the blockage but instead waited almost one year to undertake remedial actions. In addition, the repairs were made approximately six months after CWD was ordered to make repairs by the DEM.[7] Finally, CWD notified the DEP and LCC of its intention to repair the dam approximately two weeks before it did so. Based on these facts, the ALJ had sufficient evidence to conclude that CWD’s actions were not made on an emergency basis.[8]
The DEP’s actions, then, were properly within the department’s statutory and jurisdictional authority.
Erroneous Interpretation of Law
CWD next argues that the ALJ’s decision must be set aside as it is based on an erroneous interpretation of the law. Specifically, CWD alleges that Bourne v. Austin, 19 Mass.App.Ct. 738 (1985), is controlling on this case and mandates a different result than the one reached by the ALJ. In Bourne, the town sought a declaratory judgment which would have required the defendant to seek approval from the town’s conservation commission before repairing a seawall. The Bourne court held that there were three options open to a landowner seeking to make repairs in a wetland area. Id. at 740-42. The first option is for the land *84 owner to file a notice of intention. The second option is for the landowner to make a written request to the conservation commission for a determination of whether G.L.c. 131, §40 is applicable to the proposed repairs. Id. at 740-41.
It is, however, the third option which CWD argues is controlling. The third option outlined in Bourne is for the landowner “who believes that the repairs he wishes to make does not fall within [§40]“ to proceed with the proposed repairs “and take his chances on whether a civil action will be brought against him . . . or a criminal prosecution initiated . . .” Id. at 741. It is this third option which CWD pursued. The Bourne court recognized that a landowner might have “understandable reasons for choosing the third option. For example, if the commission chose to bring a civil action for a violation of the statute, it would bear the burden of proving the violation. Under the first two options, the landowner would be required to prove that he qualifies for an exemption to the regulation. Id. at 741-42. Contrary to CWD’s arguments, however, Bourne does not immunize a landowner who proceeds under this third option from subsequent liability. This argument was properly rejected by the ALJ.
CWD also argues that Bourne created a blanket rule that repair work to a dam or seawall is not an “alteration” to a wetland. The ALJ rejected this argument as well.
In Bourne, the court found that the defendant’s minor repairs to a seawall did not constitute an “alteration” pursuant to §40. Factually, however, Bourne is distinguishable from the case at bar. In Bourne, the defendants filled cracks in an existing seawall with concrete. There were no allegations that the repairs affected the pond’s water level, surrounding vegetation, or animal life.
In the present case, the ALJ heard evidence that the pond’s water level was lowered by approximately 4-6 feet. Additionally, the ALJ heard evidence that the change in water level harmed or damaged geese, ducks, small mammals, reptiles, vegetation and a variety of fish. The definition of “alter” is set out in 310 Code. Mass. Reg. 10.04 and includes “the lowering of the water level or water table,” and “the destruction of vegetation.”[9] Even in light of the Bourne decision, the plaintiffs actions constituted an alteration pursuant to G.L.c. 131, §40. The ALJ’s decision was not, therefore, based on an erroneous interpretation of law.
The plaintiff also argues that the ALJ misinterpreted c. 131, §40 in not allowing CWD to claim the public utility exemption. This exemption relieves “an existing and lawfully located structure or facility used in the service of the public and used to provide electric, gas, water, telephone, telegraph and other telecommunication services” from the written notice requirement. The ALJ found that CWD was not entitled to claim an exemption under this section as the dam was not used in the service of the public.[10] The record reflects that the ALJ’s decision on this point was based on substantial evidence. There was, therefore, no error of law.
Unlawful Procedure
CWD next argues that the ALJ’s decision was based on unlawful procedure.[11] CWD’s main contention in this area is that ALJ Francis X. Nee refused to recuse himself from hearing this case. CWD moved for recusal after Nee expressed his opinion (before the hearing) that the Bourne decision, supra, would not be dispos-itive of the case.[12] The record clearly shows that Nee did not refuse to consider the Bourne decision. Nee’s simple statement that Bourne did not mandate dismissal in no way required Nee to recuse himself from this case.
CWD also argues that the DEP’s entire procedure from the issuance of the PAN to the ALJ’s final decision was unlawful in that it was premised on the DEP’s assertion that Burncoat Pond is a great pond. In sum, the DEP argues that had this original error[13] not been made, the PAN would never have been issued and Nee would have never upheld the issuance of the PAN. CWD provides no evidence in support of either contention and, accordingly, has not met its burden of proof on this point. Moreover, with respect to the ALJ’s decision, the record directly contradicts CWD’s argument. In granting partial summary decision for the DEP, the ALJ specifically denied the DEP’s motion for summary decision with respect to the great pond issue. At the subsequent hearing held to resolve the genuine issues of material fact, the DEP conceded the great pond issue. As a result, the ALJ reduced the amount of the PAN (though he did not eliminate the PAN). Clearly, the ALJ’s actions were not based on a belief that Burncoat Pond was a great pond. Accordingly, the ALJ’s actions were not based on unlawful procedure.
Substantial Evidence/Arbitrary & Capricious
Finally, CWD makes a number of miscellaneous arguments which can be characterized as challenges to the sufficiency of the DEP’s evidence and/or as arguments that the ALJ's actions were arbitrary and capricious.[14]
CWD’s first such argument concerns the DEP’s issuance of the PAN without a prior notice of noncompliance. Section 16 of G.L.c. 21A provides that:
the department may issue such penalty without providing such written notice if such failure to comply: (1) was part of a pattern of noncompliance and not an isolated instance, or (2) was willful and not the result of error, or (3) resulted in significant impact on public health, safety, welfare or the environment. . .
The ALJ held that CWD’s actions in lowering the pond were willful and not the result of error. Accordingly, the ALJ held that no prior notice of noncompliance was required. CWD does not dispute that it intended to lower the water level in Burncoat Pond, *85 but instead argues that since it believed it was entitled to do so, its violation was not “willful.” The ALJ held, correctly, that the only intent required was the intent to lower the water level of the pond and not a specific intent to violate the statute. See, Commonwealth v. Belanger, 30 Mass.App.Ct. 31, 33 (1991). Moreover, the record reflects that CWD was fully aware of the LCC’s opinion that G.L.c. 131, §40 applied to the lowering of Burncoat Pond but chose to discount the LCC's opinion. CWD wrote to the LCC, after having received an enforcement order, informing the LCC that “our position is that we can raise or lower the dam anytime for whatever public or private purpose is involved in such activity without notification to you or your commissioner.” Clearly, then, the ALJ’s finding that CWD acted “willfully” was based on substantial evidence and was neither arbitrary nor capricious.
CWD next argues that the ALJ’s assessment of a penalty was arbitrary and capricious. In reaching his conclusion the ALJ specifically addressed the twelve factors set out in 310 Code Mass. Reg. 5.25, the Administrative Penalty Regulations.[15] The court need not rehash the ALJ’s reasoning concerning each individual factor. The ALJ’s Final Decision dated February 2, 1993 exhaustively addressed each of the twelve factors listed in 310 Code Mass. Reg. 5.25. The court finds that the ALJ’s analysis and findings concerning these factors were based on substantial evidence and neither arbitrary nor capricious.
ORDER
For the reasons outlined above, the court AFFIRMS the decision of the ALJ. Accordingly, the plaintiffs action is DISMISSED.

 Although the plaintiff has couched this action as a motion for summary judgment pursuant to a variety of statutory provisions, the plaintiffs arguments are more properly addressed pursuant to c. 30A.

 CWDA is the successor to the Central Water District Company Incorporated (“CWD”). CWD was dissolved on December 31, 1990.

 The ALJ upheld the issuance of the PAN but reduced the assessed penally from $15,400 to $7,800.

 The facts are taken from the record including the transcript from the June 2, 1992 adjudicatory hearing.

 If Burncoat Pond is great pond the base penalty would be $10,000: if it is not a great pond, the base penally IS $5,000.

 The court does not, however, feel compelled to address every detail of the multitude of claims presented in plaintiffs 66-page memorandum.

 The DEM gave CWD one year to make the necessary repairs — a fact which belies CWD’s contention that this was an emergency action taken pursuant to an order from the DEM.

 CWD provided some evidence that the repair work was made pursuant to emergency conditions, specifically heavy rains and flooding. The ALJ rejected this argument and, as the ALJ’s conclusion was based on substantial evidence, the court does not disturb this conclusion.

 The definition of “alter" included these examples at the time of the plaintiffs acts. Plaintiffs assertions to the contrary are incorrect.

 CWD argues that the “used in the service of the public" language should be read as separate from the “used to provide electric, gas, water ..." language because the phrases are separated by the word “and.” This argument is clearly erroneous.

 throughout its memorandum CWD makes various arguments concerning evidentiary rulings made by the ALJ. A thorough review of the hearing transcript leads the court to conclude that while the hearing was at times contentious, there were no errors which might have prejudiced CWD’s substantial rights. Catlin v. Board of Registration, 414 Mass. 1, 7 (1992).

 A point on which he was, incidentally, correct.

 The DEP conceded for purposes of this action only that Burncoat Pond is not a great pond.

 To the extent that the plaintiff raises questions concerning “substantial evidence” with respect to issues already addressed in other sections of this decision, the court finds the ALJ’s decision was based on substantial evidence in those areas as well.

 310 Code Mass. Reg. 5.25 requires the Department to consider each of the following criteria when determining the amount of a civil administrative penalty:
[1] The actual and potential impact on public health, safety and welfare and the environment, of the failure(s) to comply that would be penalized.
[2] The actual and potential damages suffered, and actual or potential costs incurred, by the Commonwealth, or by any other person as a result of the failure(s) to comply that would be penalized.
[3] Whether the person who would be assessed the Penalty took steps to prevent the failure(s) to comply that would be penalized.
[4] Whether the person who would be assessed the Penalty took steps to promptly come into compliance after the occurrence of the failure(s) to comply that would be penalized.
[5] Whether the person who would be assessed the Penalty took steps to remedy and mitigate whatever harm might have been done as a result of the failure(s) to comply that would be penalized.
[6] Whether the person being assessed the Penalty has previously failed to comply with any regulation, order, license or approval issued or adopted by the Department, or any law which the Department has the authority or responsibility to enforce.
[7] Making compliance less costly than the failure(s) to comply that would be penalized.
[8] Deterring future noncompliance by the person who would be assessed the Penalty.
[9] Deterring future noncompliance by persons other than the person who would be assessed the Penalty.
[10] The financial condition of the person who would be assessed the Penalty.
[11] The public interest.
[12] Any other factor(s) that reasonably may be considered in determining the amount of a Penalty, provided that said factors shall be set forth in the Penalty Assessment Notice.